**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-cr-353-JDB** |
| **MARCUS CLINT MARTIN,** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.  For the reasons set forth herein, the government requests that this Court sentence Defendant Marcus Martin to 34 months incarceration (the midpoint of the Guidelines Range) and 3 years' supervised release (run concurrently on each of his two counts of conviction), $2,000 restitution, and the mandatory assessment of $100 per conviction, for a total of $200.

## I.    INTRODUCTION

The defendant, Marcus Martin, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States

1

Shortly before 1:00 p.m. on January 6, 2021, Martin sought to embolden rioters who were in the process of overrunning the police line defending the Peace Circle—the very first breach of the restricted perimeter around the Capitol.   Martin then led the mob into the West Plaza, where he moved barricades intended to secure the area.   There, again, Martin tried to rile up the crowd against the police.   As the situation deteriorated, police began deploying crowd control measures. When one rioter, Joshua Black, was shot in the face with a pepperball, Martin began providing first aid.   But when police tried to move Black to render medical attention, rioters intervened.   In the ensuing scuffle, Martin used his shoulder to push away two Capitol Police officers in hard gear, including unidentified Officer 2.   Following a brief pause in the fighting, rioters knocked down another officer, T.R., and Martin tried to join the pile-on.   When Officer 4 rushed to protect his downed colleague, Martin began grappling with him, pulled him to the ground by his shoulder, and pinned him down by his neck and head.   Shortly thereafter, around 1:21 p.m., Martin grappled with police over barricades set up on the West Plaza.   He would remain on restricted Capitol grounds for almost two more hours.

The government recommends that the Court sentence Martin to 34 months of incarceration for his two convictions for violating 18 U.S.C. § 111(a) for his assaults on Officers 2 and 4.   A

---

Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

34-month sentence reflects the gravity of Martin's conduct, but also acknowledges his admission of guilt.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the court to the Statement of Offense filed in this case, ECF No. 24 (hereinafter "SOO") at ¶¶ 1–8, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.     Martin's Role in the January 6, 2021 Attack on the Capitol

### *Days Before January 6*

On or around January 4, 2021, Martin and his father[2] drove together from Melbourne, Florida to Alexandria, Virginia.   The same day, "Ma," likely Martin's mother, texted him that the Proud Boys were expected to wear black to blend in.   Martin responded, "Yeah, I'm going to blend pretty good."   Image 1.[3]

---

[2] As described below, during his debrief, Martin identified the individual with whom he traveled and was present with on restricted Capitol grounds as his father.   This individual has not been charged.

[3] To be clear, the Government has not identified any formal ties between Martin and any Proud Boys group at this time.

3



*Image 1: Martin and his mother texted about the Proud Boys' color scheme*

On January 5, 2021, "Ma" warned Martin, "Y'all be careful up there got guard called in."



*Image 2: Martin's mother warned him to be careful*

### Martin's Conduct on January 6, 2021

On January 6, 2021, Martin attended former President Trump's "Stop the Steal" rally by the Ellipse in Washington, D.C.  That day, Martin wore dark blue jacket, neon yellow gloves, dark cargo pants, and work boots.  *See* SOO ¶ 9; Image 3.  At times, Martin also wore a dark facemask, a black-and-white hat, or dark sunglasses.  Martin brought with him a bag containing medical supplies, which he later explained were for his father's medical condition.

4



*Image 3: Martin wore a blue jacket, neon yellow gloves, and dark pants on January 6, 2021*

Slightly before 1:00 p.m. on January 6, 2021, the mob overran a line of officers at the Peace Circle, the first breach of the defensive perimeter set up around the Capitol.    As other rioters began assaulting the outnumbered police, Martin slipped behind the line through a hole in the fencing. *See* Image 4.    Martin approached from behind the fencing and tried to rile up the crowd by raising his hands in the air and beckoning them forward.    SOO ¶ 10; *see, e.g.*, Image 5; Sentencing Exhibit (hereinafter "Sent'g Ex.") 1.



*Image 4: Martin (circled) slipped through a gap in the fencing as the mob pushed against the defensive line at the Peace Circle (https://www.youtube.com/watch?v=U3gVJ9TeBV4)*



*Image 5: Martin raised his hands and beckoned rioters forward as they breached the line (still from Sent'g Ex. 1 at approx. 1:23)*

Martin was at the front of the mob as it streamed towards the West Plaza.   Martin pushed over and removed multiple barricades at the entrance to the West Plaza, and waved the mob forward as he approached officers. *See* Image 6; Sent'g Ex. 2; *see also* SOO ¶ 10.



*Image 6: Martin (circled) knocked over barricades at the entrance to the West Plaza before encouraging rioters to advance (still from Sent'g Ex. 2)*

Martin then joined a call-and-response, beating his chest with his fist and yelling, "Our House!"  *See* Image 7.



*Image 7: Martin chanted "Our House!" in response to another rioter's call*

More and more people joined the violent mob on the West Plaza.   Martin crossed the black fencing above (*see* Image 7) and once more sought to rile up the crowd, diverting police officers' attention towards himself.   *See* Image 8/Sent'g Ex. 3.   Other rioters took advantage of the distractions created by Martin and breached the fence.



*Image 8: Martin went beyond the police line to rile up rioters (still from Sent'g Ex. 3)*

A line of police in riot gear stood guard near the stairwells leading to the Lower West Terrace, while from above, a police officer deployed pepperballs as riot control.   After another rioter, Joshua Black, was hit by a pepperball, Martin sought to render first aid using items from his medical bag and bandages.   *See* Image 9.   Martin's father stood nearby.



*Image 9: Martin (circled) provided first aid to another rioter, Joshua Black, with the materials in his medical bag and bandages provided by another rioter*

One officer in riot gear tried to move Black to render aid.   SOO ¶ 12.   Two other rioters, including Landon Copeland, began to scuffle with that officer, who was immediately assisted by unidentified Officer 1.   Seeing this, Martin moved in and pushed Officer 1 with his left shoulder, briefly joining Copeland before Copeland pushed Officer 1 over.[4]   *See* Image 10; Sent'g Ex. 4 at ~0:34–0:36.   When another unidentified officer, Officer 2, tried to push Martin back, Martin shifted his focus and pushed Officer 2 with his shoulder.   *See* Image 11; Sent'g Ex. 4 at 0:36–0:41.   Officer 2 then repelled Martin. Sent'g Ex. 4 at 0:41–0:42.

---

[4] Martin pleaded guilty only to his assaults against Officers 2 and 4 in Counts Three and Five of the Indictment, and the Government agreed to dismiss the remaining counts at sentencing. Nonetheless, the Court may—and should—consider the conduct that is the basis for those remaining Counts as part of its obligation to select a sentence that is sufficient, but not greater than necessary, to give effect to the sentencing factors set forth in 18 U.S.C. § 3553(a).



*Image 10: Martin (circled yellow) pushed Officer 1 with his left shoulder (approx. 0:32 of Sent'g Ex. 4)*



*Image 11: Martin (circled yellow) then uses his body to push Officer 2 (blue square) (approx. 0:40 of Sent'g Ex. 4)*

After a short pause in the fighting, Copeland pushed another rioter, Christopher Quaglin, into Officer T.R., who fell to the ground.   SOO ¶¶ 13–14; Sent'g Ex. 5.[5]   Martin tried to join the pile-on: dropping his left shoulder, darting behind Copeland, and appearing to reach his left arm towards Quaglin and T.R.   *See* Sent'g Exs. 4 (1:17) and 5 (0:20); Images 12 and 13.[6]



*Images 12 and 13: Martin (circled yellow) reached towards downed Officer T.R. (approx. 1:17 of Sent'g Ex. 4, approx. 0:20 of Sent'g Ex. 5)*

Unidentified Officer 4, armed with a riot shield, moved to protect his downed colleague from Martin.   Martin pushed back Officer 4's shield and began grappling with him.   *See* Images 14, 15; Sent'g Exs. 4 and 5.

---

[5] Officer T.R. injured his knee as a result of this push.

[6] Although he is not a victim of an offense to which Martin has pled guilty, Officer T.R. has submitted a statement to the Court that the Government will seek to file under seal in connection with this memorandum.   Defense objects to the Court's consideration of this statement since it does not relate to an offense to which Martin has pled guilty.



*Image 14: Martin (hand in yellow) pushed back the shield held by Officer 4 (blue square), approx. 1:19 of Sent'g Ex. 4)*



*Image 15: Martin (circled yellow) then grappled with Officer 4 (approx. 0:26 of Sent'g Ex. 5)*

Using both hands, Martin grabbed Officer 4 by his vest and yanked him forward, bringing them both to the ground.   *See* Image 16; Sent'g Ex. 4; SOO ¶ 14.



*Image 16: Martin pulled Officer 4 (blue circle) forward by his vest (approx. 1:25 of Sent'g Ex. 5)*

As other rioters joined the pile-on on the ground, Martin used his body weight to pin Officer 4 to the ground by his neck and head.   *See* Images 17 and 18; Sent'g Ex. 4; SOO ¶ 14.   As other police intervened, Martin got up and retreated into the crowd.   Officers dragged Officer 4 to safety.



*Image 17 (left) and 18 (right): Martin pinned Officer 4 by his neck and head (approx. 1:35-:40 of Sent'g Ex. 4)*

Minutes later, at around 1:20 p.m, Martin and his father stood across from metal bike racks that MPD officers had set up on the West Plaza.   Now wearing sunglasses to cover an injury, Martin yelled at police on the line, "Why don't you take that knee then?! Why ain't you takin that knee for us?"   After another rioter tried to pull the barricade from officers, Martin grabbed and tried to wrest the barricade from the officer who was holding it.   *See* Image 19, Sent'g Ex. 6.



*Image 19: Martin tried to wrest a barricade from an MPD officer (approx. 2:16 of Sent'g Ex. 6)*

14

The officer was able to momentarily repel Martin, but Martin tried to push the barricade against the officer.   Sent'g Ex. 6.   Again, Martin was pushed back, before helping rioters successfully pull the barricade away from the line.   *See* Images 20, 21; Sent'g Ex. 6.



*Image 20 and 21: Martin tried to push the barricade and then helped the mob remove it from the line (approx. 2:18-:22 of Sent'g Ex. 6)*

Martin remained on Capitol grounds for at least two hours in total.   Around 2:03 p.m. Martin texted one of his contacts: "We are fighting here [in DC]. . . ." and "I lead [sic] the charge we stormed the white house."   At 2:58 p.m., Martin smoked a cigarette on the grandstand.   *See* Image 22.   At some point, he climbed to the top of the scaffolding itself.



*Image 22: Martin (circled) stood on a ledge and smoked a cigarette as officers guard the grandstands on the Upper West Terrace at 2:58 pm*

### Post-January 6

In the days after January 6, Martin celebrated his accomplishments.   On January 12, 2021, for example, he texted "hon," presumably his wife: "Well shit I guess I [was] the hero of the town." When asked what he meant, Martin explained, "Everyone knows. There [sic] like fuck yeah man win it for us."

### Arrest and Custodial Interview

The FBI arrested Martin in Panama City, Florida on July 31, 2023.   At the time of his arrest, Martin admitted that he was present in Washington, DC on January 6, but claimed that he did not know anything about assaulting an officer.   After he was provided *Miranda* warnings, Martin invoked his right to remain silent and the interview ceased.

*Post-Plea Interview*

On May 9, 2024, the Government interviewed Martin pursuant to the plea agreement's debrief provision.   According to Martin, he first learned of the January 6, 2021 rally from his family members.   Those family members—which included Martin's father, who assertedly showed Martin YouTube videos and social media on his phone—told Martin that the 2020 election was "all against Trump" and the "[b]allot mailing weren't fair and right."   By attending the rally, Martin thought his presence might "make a big difference" and that by adding his presence, he hoped there would be enough people to sway the election.

Martin stated that while he knew who the Proud Boys were, he was not a Proud Boy and did not know or coordinate with any person who was a Proud Boy that day.   Martin said that he did not know about the color scheme of clothing Proud boys would be wearing that day—even though, as noted above, he exchanged text messages with his mother about that very topic on January 4, 2021.   Martin identified the individual with whom he traveled and was present with on restricted Capitol grounds as his father, and that he had brought the medical bag containing supplies due to his father's medical condition.   Martin further stated he marched from the Washington Monument to the Capitol Building beginning at 12:00 p.m. because Trump had told the crowd to march to the Capitol, admitting that, while he was not thinking that far ahead, he hoped to stop the election.   Martin said that he was prone to explosive anger and that on January 6, he got riled up and caught up in the crowd, which led to his violent conduct.   Martin told the FBI that, after committing the assaults he'd been charged with, he stayed around the Capitol Building "bitching at police," chanting, and "acting like a hooligan."   He and his father left

Capitol grounds after his father told him that Pence had done something; Martin said he did not know exactly what Pence had done.  Martin told the interviewers that, when he returned to Melbourne, Florida the following day, after January 6, he was still sore and tired from the previous day and being pepper sprayed.

When asked about whether he was concerned about being arrested for his actions, Martin said that he thought "if they get me they get me," and because nobody came for him at first, he thought it was "water under the bridge."

### III.   THE CHARGES AND PLEA AGREEMENT

On October 4, 2023, a federal grand jury returned an indictment charging Martin with ten counts, including violating 18 U.S.C. § 111(a) for his assaults of Officers 2 and 4, respectively. On March 7, 2024, Martin was convicted of those offenses based on a guilty plea entered pursuant to a plea agreement.

### IV.   STATUTORY PENALTIES

Martin now faces sentencing on two counts of 18 U.S.C. § 111(a) for assaulting Officer 2 and 4.   As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, the defendant faces up to 8 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100 on each count of conviction.

### V.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49

(2007).  As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR:

Count Three: 18 U.S.C. § 111(a)(2) (Officer 2)

|  |  |  |  |
|---|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level |  | 14 |
| U.S.S.G. § 3A1.2(b) | Official Victim |  | +6 |
|  |  | **Total** | **20** |

Count Five: 18 U.S.C. § 111(a)(1) (Officer 4)

|  |  |  |  |
|---|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level |  | 14 |
| U.S.S.G. § 3A1.2(b) | Official Victim |  | +6 |
|  |  | **Total** | **20** |

| Units Analysis (U.S.S.G. §§ 3D1.2, 1.4) | +2 |
|---|---|
| *Count Three and Five are two separate groups as they involve different victims.* | |

| | |
|---|---|
| **Combined Offense Level** | **22** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | -3 |
| **Total Adjusted Offense Level:** | **19** |

*See* PSR ¶¶ 35–54; Plea Agreement at ¶ 5(A).

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed.   PSR  ¶ 58.   Accordingly, based on the government's calculation of the defendant's total adjusted offense level, after acceptance of responsibility, at 19, Martin's

Guidelines imprisonment range is 30 to 37 months.   The defendant's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.   Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Martin's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis.   Martin pushed over barricades as the mob first penetrated the West Front and sought to incite the mob, waving them forward and beating his chest.   When an officer tried to help an injured rioter, Martin raged—using his shoulder as a battering ram against Officer 2 and grappling, yanking, and pinning Officer 4 to the ground.   Martin's fury—as well as his hope he would make a "big difference" in the election—would keep him on Capitol grounds for hours, including wresting defensive barricades from the outnumbered police on the West Plaza. The nature and circumstances of Martin's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 34 months.

### B.  The History and Characteristics of the Defendant

Martin has two prior criminal convictions: convictions for driving under the influence and resisting without violence.   PSR ¶¶ 56–70.   In addition, Martin was charged with felony battery in 2015, suggesting a pattern of assaultive behavior, but pled to a companion charge and was placed

on probation.   PSR ¶ 69.   By his own admission during his debrief, Martin has an anger problem, and he has shown no signs of addressing it.   Further, while Martin's military service with the National Guard is laudable, it renders his violent conduct on January 6 against uniformed law enforcement all the more concerning.   PSR ¶ 94.

**C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration.   Martin's criminal conduct on January 6 was the epitome of disrespect for the law.

**D.     The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[7] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

Although Martin has now accepted responsibility for his actions, he has shown no remorse. In the days after January 6, Martin hailed his violent conduct as making him "hero of the town"

---

[7] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

21

and he boasted that he would "win it"— presumably the Presidency—for "us".   Martin did not view his violent assaults against police as wrongful in any way—as Martin admitted in his debrief, "if they get me they get me."   *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).   And had he not been caught, Martin would have viewed his crimes as "water under the bridge."   This cavalier attitude towards the violence he inflicted on police shows that only a significant jail sentence can specifically deter Martin from engaging in this violent conduct again.

In addition, Martin has not been fully candid during his interactions with law enforcement. Upon his arrest in this case, Martin first denied the assaultive conduct to which he has now pled guilty.   And during his post-plea interview, as noted earlier, Martin claimed that he did not know what the Proud Boys would be wearing on January 6.   But this assertion contradicts a text he received from his mother on January 4 telling him that they were wearing all black to blend in— which Martin acknowledged by saying he would blend in too.

Given his lack of remorse for his assaults, Martin's sentence must be sufficient to provide specific deterrence from committing future crimes of violence.

### E.      The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.      Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[8] "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

---

[8] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[9] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

Landon Copeland participated for roughly four to five minutes in the same violent assaults as Martin, including by pushing Quaglin into Officer T.R.   *United States v. Landon Copeland*, 21-cr-570 (APM) (D.D.C.).   Like Martin, Copeland also engaged in a tug of war with officers over a barricade, though Copeland ultimately charged at and tossed that barricade at officers.   In an echo of Martin's own cavalier attitude, Copeland showed a complete lack of remorse for his conduct, saying he regretted nothing and would do it all again for the people he loved.   Based on an offense level of 21—which included a dangerous weapon enhancement—and Copeland's significant criminal history (Category III), Copeland's guidelines range was 46 to 57 months on his single Section 111(a) conviction.   Judge Mehta imposed a sentence of 36 months incarceration, a significant downward variance due to Copeland's serious mental health issues and military service-related PTSD,[10] as well as supervised release and restitution.   There is no evidence of similar mitigating factors in Martin's case.   And despite his lesser offense level and

---

[9] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

[10] For example, Copeland made disturbing threats to his pretrial services officer and was detained as a result.   *See Gov't Sent'g Mem.* at 20–21, ECF No. 39, 21-cr-570-APM (D.D.C.).

criminal history, Martin dangerously pinned Officer 4 by the neck and head in one of *two* assaults of which he is convicted.   Martin also spent significantly longer on Capitol grounds (2 hours), and incited other rioters at multiple junctures.   Martin's almost identical offense conduct merits a jail sentence of similar length.

This Court previously sentenced Michael Dickinson on one count of 18 U.S.C. § 111(a) to 20 months incarceration followed by 36 months supervised release (plus restitution).   *United States v. Michael Dickinson*, 21-CR-649 (JDB) (D.D.C.).   On the North side, Dickinson threw a coffee tumbler at one officer, hitting him in the face shield and chest, and dumped a bucket containing an unknown liquid on another group of officers.   Martin's assaults were far more egregious because they were hands-on—he grappled with officers directly, and yanked and pinned Officer 4 by his head.   Martin's post-January 6 statements show a lack of contrition and awareness of the wrongfulness of his conduct, indicating that a sentence of significantly greater length is necessary to specifically deter Martin from such violent conduct.

Finally, Cale Clayton pleaded guilty to two counts 18 U.S.C. § 111(a) for his assaults on officers on the Upper West Terrace.   *United States v. Cale Clayton*, 22-CR-139 (RCL) (D.D.C.). Clayon (a) grabbed one officer's shield and stole another's baton, (b) grabbed and pulled a third officer's shield, and (c) shoved a fourth officer in the head and grabbed his face mask.   Clayton had the same Guidelines Range as Martin of 30 to 37 months; Judge Lamberth sentenced Clayton to 30 months.   Clayton had significantly mitigating family circumstances that Martin does not, and both of Martin's assaults—his push against Officer 2, and his grappling, yanking, and pinning

Officer 4—were more egregious than Clayton's, suggesting that a slightly longer sentence is appropriate.

## VII.    RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[11]  Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here.   The victims of the counts of conviction in this case, Officers 2 and 4, have not been identified.   The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Martin must pay $2,000 in restitution, which reflects in part the

---

[11] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

role Martin played in the riot on January 6.[12] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Martin's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 136.

## VIII.   FINE

The defendant's convictions for violations of 18 U.S.C. § 111(a) subject him to a statutory maximum fine of $250,000 on each count. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023).   Here, the defendant's financial assets set forth in the PSR suggest that the defendant is unable, and is unlikely to become able, to pay a fine.

---

[12] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 34 months incarceration and 3 years' supervised release (run concurrently on each of his two counts of conviction), $2,000 restitution, and the mandatory assessment of $100 per conviction for a total of $200.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:      */s/ Michael L. Barclay*
MICHAEL L. BARCLAY
Assistant United States Attorney
N.Y. Bar Reg. No. 5441423
U.S. Attorney's Office for the District of Columbia
601 D Street, NW
Washington, D.C. 20001
(202) 252-7669
Michael.Barclay@usdoj.gov